**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**The WESTIN HOTEL, Respondent.**

**No. 84–5093.**

United States Court of Appeals, Sixth Circuit.

Argued Jan. 16, 1985.

Decided April 3, 1985.

Elliott Moore, Ann Jones, argued, Deputy Associate Gen. Counsel, N.L.R.B. Washington, D.C. for petitioner.

Thomas E. Marshall, argued, A. David Mikesell, Honigman, Miller, Schwartz & Cohn, Detroit, Mich., for respondent.

Before ENGEL, KRUPANSKY and WELLFORD, Circuit Judges.

KRUPANSKY, Circuit Judge.

The N.L.R.B. petitions this court to enforce an order directing the Westin Hotel Corporation (Westin) to reimburse Lee Ann Maniaci (Maniaci), an employee wrongfully discharged by the Westin, in an amount of $8,020.57 plus interest as backpay and benefits. The Westin stipulated that the discharge was in violation of the National Labor Relations Act [1] but opposed enforcement of the order by charging that Maniaci did not exert a reasonably diligent effort to seek employment during the period covered by the backpay assessment.

The Westin unlawfully terminated Maniaci on December 22, 1978, after employing her as a cocktail waitress for about 20 months. Maniaci had no experience with the Westin, or with any other employer, in the area of food service. Her only work experience was the serving of beverages and soft drinks. Prior to working for the

---

1. Maniaci was discharged for serving as the intermediary who transmitted employees' complaints about working conditions and the employer's alleged violations of the collective bargaining agreement to her supervisors.

Westin, she had been continuously employed by the Book Cadillac Hotel for 13 years as a cocktail waitress. Maniaci resided in Frazer, Michigan, and had commuted to her place of employment at the Westin in downtown Detroit, a distance of about 25 miles from her residence.

Maniaci began looking elsewhere for employment as a cocktail waitress the same evening that she was unlawfully terminated by the Westin. She applied personally for work at Steak 'N Ale, an establishment with a cocktail bar about ten miles from her home. No job was available, but Maniaci returned on two or three subsequent occasions during the backpay period, i.e. Dec. 12, 1978 to March 17, 1980. Maniaci then solicited and received a very favorable letter of recommendation from the previous manager at the Book Cadillac Hotel to aid her in obtaining employment. She also sought work during December, 1978, at Pat O'Grady's, a bar and restaurant about eight to ten miles from her home, but there were no openings available.

On January 2, 1979, Maniaci registered with the Michigan State Employment Commission ("Employment Commission"), reporting that she was seeking employment as a cocktail waitress. On that same day, Maniaci filed a grievance with her Union in an attempt to gain reinstatement with the Westin. Maniaci stated that she devoted the majority of her time in January, 1979, to soliciting letters from co-employees to support her theory that she was wrongfully discharged, and added that her Union failed to assist her in this endeavor. She also contacted Danny's Copa Lounge in January but was advised that it had no employment openings. Maniaci filed a charge against the Westin with the N.L.R.B. during this same month.

In February, 1979, Maniaci sought employment at several cocktail lounges and bars within approximately a 10 mile radius of her home, to wit, the Steak N' Ale, the Flying Dutchman Motor Inn, the Royal Touch, and Clem's Pour House. She was interviewed by the manager of the Flying Dutchman, but she testified that "when he found out the circumstances of my discharge [at the Westin] he didn't seem too interested."

During March, 1979, Maniaci was interviewed by the manager of the lounge at the Shelby Inn, which was about 10 miles from her home. She left her name, telephone number and the letter of recommendation, but no employment vacancies were available. Maniaci averred that she subsequently made inquiries at the Shelby Inn on at least three occasions following the interview but no positions were available. Maniaci also visited or contacted Wine Tasters and Fillippa's Wine Barrel during March, but to no avail. At the Wine Tasters, Maniaci spoke to the manager but did not leave an application because she did not have the requisite food service experience to secure employment at that establishment.

At the beginning of April, Maniaci contacted the Three Faces Disco, an establishment about 12 miles from her home, where she subsequently obtained an interview and was hired as a cocktail waitress. She purchased a required uniform and shoes for about $60 and commenced working. The first night there was a heavy downpour. As a result "the toilets backed up, the sinks backed up and the drains in the service bar area backed up" causing a two inch accumulation of water and sewage that soaked Maniaci's feet and ruined her new shoes. The other waitresses told her that this happened each time it rained. Although it did not rain the second night, the floor remained wet, and at the end of her shift she spoke with the manager and terminated her job because of the poor working conditions. She knew that one other employee also terminated her employment due to the adverse conditions.

After leaving the Three Faces Disco in mid-April 1979, Maniaci "did a lot of looking" for another job. Her efforts included completing applications at Gino's Surf Lounge and the Georgian Inn. She also monitored the newspaper want ads and telephoned the Park Lane Lounge and Pat O'Grady's, but found no openings. On May 23, 1979, Maniaci began working as a

part-time cocktail waitress at the Georgian Inn motel in Roseville, Michigan, about five miles from her home. At the time she was hired, the manager advised her that he would soon be "letting another girl go" and Maniaci was promised that her part-time status would change to full-time "as soon as possible".

About two days after she commenced working at the Georgian Inn, Maniaci was offered employment by Gino's Surf Lounge. Maniaci refused the part-time slot available at this place of business because she was already employed. She remained at the Georgian Inn as a cocktail waitress for six weeks until the manager discharged her in late June, 1979, upon discovering that she was collecting partial unemployment benefits to which she was entitled as a result of her discharge from the Westin.

In November, 1979, Maniaci was employed at the Shore Point Motor Lodge, about ten miles from her home. She worked four days a week, just as she had for the Westin at the time of her unlawful discharge. Maniaci continued to work for the Shore Point Motor Lodge after the Westin terminated her backpay period by offering her reinstatement on March 17, 1980.

Based upon Maniaci's work history as outlined above during the interim period between her discharge by the Westin and employment at the Shore Point Motor Lodge, the N.L.R.B. determined that Maniaci was entitled to $8,114.57 in back pay.

In an effort to rebut Maniaci's testimony that she had fully utilized the services provided by the state employment agency, the Westin relied solely upon the testimony of Richard Elliot of the Michigan Employment Security Commission's occupational research section. Elliot explained that the employment service retained (on microfilm) lists of job openings in the Detroit area by occupation, and through his testimony the Westin entered into evidence the number of listings for "bar waiters/waitresses" during nine of the months relevant to the interim period.[2] On cross examination, however, it was disclosed that the "Detroit area" job listings actually covered seven counties, some of which would involve a 30 to 120 mile commute (one way) for Maniaci. Elliot further informed the a.l.j. that the name of a potential employer did not appear on the microfilm, but rather the entries were coded, and that an applicant would have to be "referred specifically" for a particular opening. Elliot also stated that while it was the agency's "policy" to inform those seeking employment of the availability of the microfilm lists, he did not have first hand knowledge of whether the policy was fully implemented. Maniaci stated that she had never been advised of the lists by agency personnel.

Based on the foregoing, the a.l.j. determined that the Westin had not met its burden of proof establishing that Maniaci had failed to use "due diligence" to obtain employment following her wrongful discharge by the Westin.

 Section 10(c) of the National Labor Relations Act, 29 U.S.C. § 160(c), authorizes the Board to fashion appropriate remedial orders including the award of backpay. The Board's "broad discretionary" authority in awarding backpay as a remedy for unfair labor practice is firmly established. *NLRB v. J.H. Rutter-Rex Mfg. Co.*, 396 U.S. 258, 263, 90 S.Ct. 417, 420, 24 L.Ed.2d 405 (1969). The Board's exercise of its discretion in formulating backpay awards is subject to a limited amount of scrutiny by the judiciary. *Fiberboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 215, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964); *Alfred M. Lewis, Inc. v. NLRB*, 681 F.2d 1154, 1156 (9th Cir. 1982). In addition, it is beyond peradventure that the defense of willful loss of earnings is an affirmative defense, with the burden of proof resting upon the employer. *McCann Steel v. NLRB*, 570 F.2d 652, 655

---

**2.** For example, in January, 1979, there were four such listings; 11 in February; 25 in April; 28 in May; and 23 in July.

n. 4 (6th Cir.1978); *NLRB v. Reynolds*, 399 F.2d 668, 669 (6th Cir.1968).

 Further, a wrongfully-discharged employee is only required to make a reasonable effort to mitigate damages, and is not held to the highest standard of diligence. This burden is not onerous, and does not mandate that the plaintiff be successful in mitigating the damage. *Rasimas v. Michigan Dept. of Mental Health*, 714 F.2d 614, 624 (6th Cir.1983); *EEOC v. Lee Way Motor Freights, Inc.*, 625 F.2d 918, 938 (10th Cir.1979); *NLRB v. Pilot Freight Carriers, Inc.*, 604 F.2d 375, 377 (5th Cir.1979). The reasonableness of the effort to find substantially equivalent employment should be evaluated in light of the individual's background and experience and the relevant job market. *Rasimas, supra,* and cases cited therein; *Heheman v. Scripps Co.*, 661 F.2d 1115, 1125 (6th Cir.1981).

 Finally, it must be remembered that the Board's conclusion as to whether an employer's asserted defenses against liability have been successfully established will be overturned on appeal only if the record, considered in its entirety, does not disclose substantial evidence to support the Board's findings. *NLRB v. Carpenters Local 1913*, 531 F.2d 424, 426 (9th Cir.1976) (*citing Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951)); *NLRB v. Interurban Gas Co.*, 354 F.2d 76, 78 (6th Cir.1965) ("substantial evidence" standard of review applicable to Board's backpay awards). *See also NLRB v. E.I. DuPont DeNemours*, 750 F.2d 524 (6th Cir.1984) at 527 (per curiam) ("substantial evidence rule" generally applicable to Board's factual determinations).

 The general rule in labor cases is that "an employee must at least make reasonable efforts to find new employment which is substantially equivalent to the position [lost] ... and is suitable to a person of his background and experience". *Heheman, supra,* (*quoting NLRB v. Madison Courier, Inc.*, 472 F.2d 1307, 1318 (D.C.Cir. 1972)) (citations and original emphasis omitted). In addition, the burden of proving lack of due diligence by the wrongfully discharged employee is on the employer. Finally, the decision of the Board regarding "due diligence" is a factual one properly reviewed under the standard of substantial evidence.

In the instant case, the Westin seeks, in essence, to place the burden on the employee to prove a "systematic method of searching for a job", and further, to retain employment once secured regardless of the conditions under which the employee was required to work. Neither the courts nor the Board has recognized this as an appropriate standard. To the contrary, basic principles of equity and fairness mandate that the burden of proof must remain on the employer because the employer's illegal discharge of the employee precipitated the search for another job.

 The dissent places great emphasis on Maniaci's failure to seek employment in the Detroit area as support for the conclusion that Maniaci was not reasonably diligent in her effort to pursue employment. In so doing, the dissent ignores two factors in Maniaci's favor: (1) her credited testimony that she preferred to work in a hotel cocktail lounge of comparable quality to the Westin, but did not apply at such establishments in Detroit because she was apprehensive of being refused employment without first clearing the circumstances of her charged wrongful discharge by the Westin; and (2) her inability to finance necessary repairs to her automobile to provide transportation for the 25 mile commute into Detroit. In addition, the Court must remain mindful of the fact that it was the wrongful discharge by the Westin which placed Maniaci in her unfortunate circumstances. Viewed in this light, Maniaci's failure to seek employment in Detroit is well justified, and should not be relied upon to bolster the Westin's lack of due diligence claim.

Because the determination that the employer failed to carry its burden of proof as to due diligence on the part of Maniaci is supported by substantial evidence, the

award of backpay must be and hereby is enforced.

WELLFORD, Circuit Judge, dissenting.

Maniaci was an experienced cocktail waitress, who had worked in and commuted to the downtown Detroit area for many years from her Fraser, Michigan residence before the termination in controversy occurred. As recognized by the majority, during a three month period following her termination she sought employment at several cocktail bar locations nearer to her home than downtown Detroit. At some of these locations she did not leave an employment application. During the fourth month, she accepted employment and worked for a night or two, but conditions were undesirable and she quit. She testified, without specification, that she continued to look for other cocktail waitress work but not where she had customarily worked during her years of employment in urban Detroit. Finally, six months after this very short period of working, she accepted part-time cocktail waitress work in Roseville, about five miles from her home, but was discharged after a month because her employer learned she was continuing to draw unemployment benefits. Some three or four months later, again without seeking work in Detroit,[1] she obtained comparable employment about ten miles from her home before she was reinstated by defendant Westin. The NLRB found that Maniaci had "diligently sought employment" during the interim period. The ALJ added that he could not find "a willful failure through a lack of diligence" in Maniaci's effort to find jobs outside Detroit. Thus he ordered that Westin pay her $8,020 in back pay, since it had not carried its burden to prove otherwise.

Although the burden is upon Westin to establish the lack of good faith or diligent effort on claimant's part, I doubt that the burden is properly upon the Westin to prove, as required by the ALJ, a *"willful failure"* on Maniaci's part. She may have failed simply through negligence, mistaken impression about her responsibility, or because of laziness or reluctance to seek comparable employment.[2]

Over an approximately eleven month period, then, Maniaci's efforts yielded her a total of about six weeks work, and she turned down part-time employment. She denied that the Michigan Employment Security Commission had followed its normal procedure about furnishing her lists of job openings during this period. I agree with the majority's statement that "the reasonableness of the effort to find substantially equivalent employment should be evaluated in light of the individual's background and experience and the relevant job market." Evaluating Maniaci's efforts to find such employment, I would find without much difficulty that she had failed diligently to seek work of the type she had performed for many years in Detroit, even though the burden is upon the Westin to establish this want of diligence.

The law requires "an honest good faith effort" to find employment, *NLRB v. Cashman Auto*, 223 F.2d 832, 836 (1st Cir.1955), or a "diligent effort to obtain other employment." *NLRB v. Armstrong Tire & Rubber Co.*, 263 F.2d 680, 683 (5th Cir.1959). These efforts should also be directed to essentially similar employment opportunities:

When a discriminatee has been improperly deprived of his employment position, he is under the recognized duty to make reasonable efforts to locate interim work comparable to his denied position *and* commensurate with his particular background and experience.

(Emphasis in original.) *NLRB v. Madison Courier, Inc.*, 472 F.2d 1307, 1323 (D.C.Cir. 1972).

Willfulness, for this purpose [contempt], implies a deliberate or intended violation, as distinguished from an accident, inadvertent or negligent violation.

1. The ALJ found that "Maniaci admits that she did not seek work in any of the hotels in Detroit ..." (J/A 218).

2. See *TWM Manufacturing Co. v. Dura Corp.*, 722 F.2d 1261, 1272 (6th Cir.1983):

Maniaci herself admitted she failed to make any effort (for reasons found unjustifiable by the ALJ) to find comparable work *in Detroit,* and she conceded that she would likely have accepted work in Detroit "if they had asked me." She returned to work in downtown Detroit when reinstated.

I would therefore have reduced the back pay award by at least one-half for the failure diligently to seek comparable cocktail waitress work. I respectfully therefore dissent.