773 F.2d 77
 120 L.R.R.M. (BNA) 2514, 103 Lab.Cas. P 11,622
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
MASTER SLACK AND/OR MASTER TROUSERS CORP., Hardeman Garment
Corp., Morehouse Garment Corp., Lauderdale Garment
Corp., and Lobelville Garment Corp., Respondents.
 No. 84-5387.
 United States Court of Appeals,
Sixth Circuit.
 Argued April 4, 1985.
Decided Sept. 17, 1985.
 
 Elliott Moore, W. Christian Schumann, Michael David Fox, Deputy Associate Gen. Counsel, N.L.R.B., National Labor Relations Board, Margaret Bezou, argued, Washington, D.C., for petitioner.
 Thomas J. Hughes, Jr. (argued), Jackson, Lewis, Schnitzler & Krupman, Ann Bachman Hale, Atlanta, Ga., for respondents.
 
 
 1
 Before KEITH and KRUPANSKY, Circuit Judges, and COHN, District Judge.*
 
 
 2
 COHN, District Judge.
 
 
 3
 The National Labor Relations Board (the Board) petitions to enforce a supplemental back pay order directing respondents to make whole 28 discriminatees[1] who were wrongfully discharged by Hardeman Garment Corp. (Hardeman), a subsidiary of Master Slack and/or Master Trousers Corp.[2] Respondents challenge the Board order only as it relates to 11 discriminatees,[3] and do not dispute the back pay awards ordered for the other 17.[4] Their primary contention is that the Board erred in holding that certain findings made in the underlying unfair labor practices proceeding precluded respondents from contending in the back pay proceeding that a plant shutdown should cut off the back pay awards. Respondents also contend the Board's back pay awards to two discriminatees[5] are not supported by substantial evidence.
 
 
 4
 For the reasons stated below, we enforce the order only in part.I. HISTORY
 
 
 5
 On July 20, 1973, the Amalgamated Clothing and Textile Workers Union, AFL-CIO (the Union), won an election among Hardeman's production and maintenance employees at a plant located in Bolivar, Tennessee. The Union was certified by the Board on January 4, 1974.
 
 
 6
 Hardeman opposed the Union's certification and continued to operate on the whole as if the Union didn't exist. The Union filed several unfair labor practice charges from 1973 through 1974 over various company practices. The charges were consolidated and a single hearing was held before administrative law judge Thomas A. Ricci. As relevant here Judge Ricci found that Hardeman had violated Section 8(a)(3) of the National Labor Relations Act (the Act), 29 U.S.C. Sec. 158(a)(3),[6] in terminating the night shift at the Bolivar plant, which resulted in the lay off of 20 workers, 3 days before the union election.
 
 
 7
 The Board, after exceptions were filed by both sides to Judge Ricci's order, affirmed this ruling and determined that Hardeman had also violated Sections 8(a)(1) and (5) of the Act, 29 U.S.C. Sec. 158(a)(1) and (5),[7] in laying off 8 more employees due to stricter enforcement of absenteeism and tardiness rules after the Union won the election. The Board further found Hardeman had violated Sections 8(a)(1) and (5) in failing to notify and bargain with the Union prior to the layoff of all employees (about 400) when the Bolivar plant was shut down in the fall of 1974 and also in failing to notify and bargain with the Union when the plant was reopened in 1975 and 80 employees were recalled. This court enforced the Board's order. See NLRB v. Master Slack, 618 F.2d 6 (6th Cir.1980).
 
 
 8
 Judge Ricci, in discussing the appropriate remedy in the unfair labor practices proceeding, found that back pay awards in many cases should continue past the plant shutdown in 1974, even though he had earlier stated, "[t]here is no contention by the General Counsel that the 1974 closing was occasioned by anything other than purely economic factors." In their orders neither Judge Ricci nor the Board stated that back pay awards should run for any particular period; the orders merely stated that wrongfully discharged employees should be made whole "for any loss of pay or any benefits they may have suffered by reason of Respondent's discrimination against all of them." Respondents did not object to Judge Ricci's specific findings made about the length of the back pay periods in either their exceptions to the Board or in the enforcement proceeding before this court.
 
 
 9
 When the parties were unable to agree on compliance a supplemental hearing was held on June 23 and 24, 1981 before administrative law judge Philip P. McLeod. Judge McLeod rejected the company's argument that the plant shutdown in 1974 should cut off back pay awards for all discriminatees. He concluded the doctrine of res judicata barred respondents from relitigating that issue since Judge Ricci had found that back pay awards in several instances continued past the shutdown. He further concluded that since respondents had acted unlawfully in shutting down and reopening the plant by failing to bargain with the Union the back pay awards should continue past that point.
 
 
 10
 In this proceeding for enforcement of the Board's back pay order respondents contend Judge Ricci's findings should not preclude relitigation on the effect of the plant shutdown on back pay awards. Respondents also contend there is not substantial evidence in the record to support the back pay awards to Willie Spencer and Margie Wilson.II. ISSUE PRECLUSION[8]
 
 
 11
 We must first determine whether Judge Ricci's general finding that many back pay periods were to continue past the point of the plant shutdown precluded relitigation in the back pay proceeding on the effect of the plant shutdown on back pay awards. Generally, a factual finding which was necessary to support the judgment in a prior proceeding will bar relitigation on that issue in a subsequent proceeding involving the same parties. See Montana v. United States, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 and n. 5, 99 S.Ct. 645, 649 and n. 5, 58 L.Ed.2d 552 (1979); Marlene Industries Corp. v. National Labor Relations Board, 712 F.2d 1011, 1015-16 (6th Cir.1983); United States v. Stauffer Chemical Co., 684 F.2d 1174, 1180 (6th Cir.1982), aff'd, 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984). The policies underlying this rule include the preservation of judicial resources and the protection of litigants. Montana, supra, 440 U.S. at 153-54, 99 S.Ct. at 973-74. The findings of agencies made in the course of proceedings which are judicial in nature should be given the same preclusive effect as findings made by a court. United States v. Utah Construction & Mining Co., 384 U.S. 394, 421-22, 86 S.Ct. 1545, 1559-60, 16 L.Ed.2d 642 (1966).
 
 
 12
 Issue preclusion should only be applied where the identical issue sought to be relitigated was actually determined and necessarily decided in a prior proceeding in which the litigant against whom the doctrine is asserted had a full and fair opportunity to litigate the issue. See Montana, supra, 440 U.S. at 153, 99 S.Ct. at 973; Parklane Hosiery, supra, at 326 n. 5; Marlene Industries, supra, at 1015-16. A factual issue is "necessarily decided" if its determination was necessary to support the judgment entered in the prior proceeding. See 18 Wright, Miller & Cooper, Federal Practice & Procedure Sec. 4421, p. 192; Marlene Industries, supra, at 1015-16.
 
 
 13
 While the effect of the 1974 shutdown and 1975 reopening of the plant was actually litigated in the underlying unfair labor practices proceeding it was not necessary to the Board's order. Accordingly Judge Ricci's findings cannot preclude relitigation on that issue in the supplemental backpay proceeding.
 
 
 14
 " 'It is basic to the law of [issue preclusion] that a finding in one proceeding cannot bind tribunals in subsequent cases unless the finding acted as a basis for final judgment in the first.' 'The determination of an issue in an earlier proceeding must be essential to the judgment; it cannot be dicta.' " (citations omitted)Marlene Industries, supra, at 1015-16. See also Block v. Bourbon County Commissioners, 99 U.S. (4 Otto) 686, 693, 25 L.Ed. 491 (1878); Segal v. American Telephone & Telegraph Co., Inc., 606 F.2d 842, 845 n. 2 (9th Cir.1979); Evans v. Wilkerson, 605 F.2d 369, 372 (7th Cir.1979).
 
 
 15
 Judge Ricci's finding that back pay periods should continue past the point of the plant shutdown was not essential to either his order or the Board's order; it was mere dicta. The Board's order, like Judge Ricci's order, simply states that respondents "shall ... [m]ake all ... [wrongfully discharged] employees whole for any loss of pay or any other benefits they may have suffered by reason of the respondent's discrimination against all of them." This is typical of orders in unfair labor practices proceedings where the Board simply determines if unfair labor practices have occurred and what remedies would effectuate the purposes of the Act. See NLRB v. Deena Artware, Inc., 361 U.S. 398, 411, 80 S.Ct. 441, 447, 4 L.Ed.2d 400 (1960) (Frankfurter, J., concurring); 29 C.F.R. Sec. 102.45. The exact amount of back pay owing is not stated and is left to be determined in a subsequent back pay proceeding if the parties cannot resolve the amounts owing informally. See Deena Artware, supra; 29 C.F.R. Sec. 102.52. Drawing an analogy from court cases, the unfair labor practices proceeding determines liability; a subsequent back pay proceeding, if necessary, determines damages.
 
 
 16
 The only factual determinations necessarily decided to enter an order that discharged employees be made whole are (1) that the respondent violated the Act in discharging employees, and, (2) that back pay is an appropriate remedy. See Section 10(c) of the Act, 29 U.S.C. Sec. 160(c). It is not necessary to determine the exact amount of back pay owing nor whether subsequent events would have resulted in layoffs of discharged employees totally apart from the wrongful conduct.
 
 
 17
 "[Q]uestions relating to the exact amount of back pay owing (including whether ... at some reasonably determinable date employment with [the company] would not have been available because [company] operations would have ceased for independent, nondiscriminatory reasons) are prematurely raised in [an] enforcement petition. Those issues may be explored in a compliance proceeding."
 
 
 18
 Great Chinese American Sewing Co. v. NLRB, 578 F.2d 251, 255-56 (9th Cir.1978). See also, NLRB v. Dazzo Products, Inc., 358 F.2d 136, 138 (2nd Cir.1966).
 
 
 19
 In sum, Judge Ricci's finding that back pay awards should continue past the point of the 1974 plant shutdown was not necessary to support his order or the Board's order and therefore his finding does not bar relitigation on that issue. To the contrary, the determination of whether the shutdown should cut off back pay awards belonged in the back pay proceeding.
 
 III. SECTION 8(a)(5) VIOLATIONS
 
 20
 This does not settle the matter since Judge McLeod did not solely rely on the doctrine of issue preclusion in ruling that the plant shutdown would not terminate back pay awards. He alternatively ruled against respondents because Hardeman violated Sec. 8(a)(5) in failing to bargain with the Union when the plant was shut down in 1974 and reopened in 1975. He reasoned:
 
 
 21
 "Respondent's argument [that the plant shutdown should terminate all backpay awards] overlooks the fact that the Board, with Circuit Court agreement, found the method in which Respondent effected both the layoff and recall to be unlawful in violation of Section 8(a)(5) of the Act. In order to find merit to this asserted defense of Respondent, one would have to invoke a presumption that if Respondent had acted lawfully and fulfilled its obligation to bargain with the Union in good faith, the exact same result would have occurred as did occur. Since it is impossible to determine what would have occurred if Respondent had fulfilled its lawful obligation to bargain with the Union, Respondent's unlawful conduct could not serve to terminate backpay."
 
 
 22
 Judge McLeod's ruling, however, does not have factual support in the record and the remedy of back pay past the plant shutdown goes beyond the scope of proper remedies under the Act.
 
 
 23
 Section 10(c) of the Act, 29 U.S.C. Sec. 160(c), charges the Board with "taking such affirmative action including reinstatement of an employee with or without back pay as will effectuate the policies of [the Act]." The Board's discretion to fashion appropriate remedies for violations of the Act is quite broad and its choice of remedies should be set aside only if "it can be shown that the order is a patent attempt to achieve ends other than those which can be fairly said to effectuate the policies of the Act." NLRB v. J.H. Rutter-Rex Mfg. Co., 396 U.S. 258, 263, 90 S.Ct. 417, 420, 24 L.Ed.2d 405 (1969) (citation omitted).
 
 
 24
 Back pay awards are intended to "mak[e] employees whole for losses suffered on account of an unfair labor practice." Id. (citation omitted). The purpose is to "restor[e] the economic status quo that would have obtained but for the company's wrongful [act]." Id. It is improper, however, to award back pay if an employer can show that even if employees had been treated with total fairness they would have been discharged at a later date. See NLRB v. J.S. Alberici Construction Co., Inc., 591 F.2d 463, 470 n. 8 (8th Cir.1979); NLRB v. Amoco Chemicals Corp., 529 F.2d 427 (5th Cir.1976).
 
 
 25
 The Board ordered that backpay awards of employees discharged in 1973 continue past the shutdown of the Hardeman plant in the fall of 1974 solely because Hardeman failed to bargain with the Union over the effects of the shutdown and subsequent reopening of the plant. There was no finding, and no evidence, that the shutdown of the plant was motivated by any anti-union animus in violation of Sec. 8(a)(3).[9]
 
 
 26
 Backpay can be an appropriate remedy for a Sec. 8(a)(5) violation. See Morrison Cafeterias Consolidated, Inc. v. NLRB, 431 F.2d 254 (8th Cir.1970); Avila Group, Inc., 218 NLRB 633, 89 LRRM 1364 (1975); see also The Developing Labor Law, pp. 1676-1678 (Morris ed. 2d ed. 1985). It is a proper remedy where it serves to make whole employees for losses suffered due to an employer's failure to bargain, and also where it creates an incentive for the employer to bargain in good faith with the union representing the employees. See Avila Group, supra. The backpay award in a failure to bargain case runs from the date of termination only until the parties reach agreement or a good faith impasse in bargaining, see The Developing Labor Law, supra, at 1677, and in any event is cut off if the union fails to request bargaining. Morrison Cafeterias, supra, at 254.
 
 
 27
 In this case the decision that backpay awards for employees who had been wrongfully discharged over a year before the plant shutdown continue past the shutdown does not appear to serve any proper remedial purpose under the Act. All employees suffered equally due to Hardeman's failure to bargain with the Union. The 11 employees listed in footnote 3 have no right under the Act, absent special facts, to preferential treatment over other employees. Seven of the 11 had been recalled to work before the plant shutdown. Backpay awards dating from the time each employee was wrongfully terminated until they were recalled or until the plant shutdown fully reestablishes the status quo and puts those individuals on an equal economic footing with all other plant employees. Any backpay awarded to remedy Hardeman's failure to bargain, if appropriate at all, should be awarded equally to all employees affected by the plant shutdown, since all were equally injured by Hardeman's failure to bargain, and not just to the 11 employees listed in footnote 3. The backpay awards for these 11 employees, insofar as they extend past the plant shutdown, appear to be punitive rather than remedial.
 
 
 28
 The Board's order, awarding backpay past the plant shutdown only to certain employees, can be enforced only if there is evidence in the record to support the distinction made between employees who had been illegally terminated at an earlier date and all other employees. This requires a finding that had Hardeman bargained in good faith over the effects of the plant shutdown and the subsequent reopening the 11 employees listed in footnote 3 would have been given preferential hiring rights over all other employees.
 
 
 29
 Had Hardeman bargained in good faith with the Union several things could have happened. Hardeman and the Union could have reached an agreement to keep the plant totally or partially opened. However, even after bargaining in good faith, Hardeman could still have elected to shut down the plant for purely economic reasons. Hardeman was not required to bargain over the actual decision to shut down the plant but only over the effect of that decision on its employees. See First National Maintenance Corp. v. NLRB, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981); NLRB v. Gibraltar Industries, Inc., 653 F.2d 1091 (6th Cir.1981). On the sparse record before us it is wholly speculative to state what would have happened had Hardeman bargained with the Union concerning the effects of the shutdown and reopening of its plant. It stretches credulity to suggest that the Union, charged with representing all plant employees, would have insisted that the 11 discriminatees listed in footnote 3 be given preferential hiring, disregarding their length of service in relation to other employees.
 
 
 30
 Backpay awards to the 11 employees listed in footnote 3 which extend past the plant shutdowns do not further any policy under the Act and will not be enforced.
 
 IV. WILLIE SPENCER AND MARGIE WILSON
 
 31
 Respondents specifically challenge the Board's award of back pay to two discriminatees as not supported by substantial evidence in the record. Respondents argue Willie Spencer never looked for replacement work after being discharged from Hardeman and is therefore not entitled to back pay. Respondents also contend Margie Wilson failed to engage in a diligent search for interim employment after the second quarter of 1974.
 
 
 32
 When an employee is discharged due to anti-union animus there is a presumption that some back pay is owing. NLRB v. Mastro Plastics Corp., 354 F.2d 170, 178 (2nd Cir.1965), cert. denied, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966). The respondent has the burden of proving that a back pay award should be reduced due to a willful failure to seek interim employment. McCann Steel v. NLRB, 570 F.2d 652, 655 n. 4 (6th Cir.1978). This court recently summarized the law concerning the failure of discharged employees to mitigate damages in NLRB v. The Westin Hotel, 758 F.2d 1126 (6th Cir.1985):
 
 
 33
 "[A] wrongfully discharged employee is only required to make a reasonable effort to mitigate damages, and is not held to the highest standard of diligence. This burden is not onerous, and does not mandate that the plaintiff be successful in mitigating the damage.
 
 
 34
 Finally, it must be remembered that the Board's conclusion as to whether an employer's asserted defenses against liability have been successfully established will be overturned on appeal only if the record, considered in its entirety, does not disclose substantial evidence to support the Board's findings."
 
 
 35
 Id. at 1130 (citations omitted).
 
 A. Willie Spencer
 
 36
 Willie Spencer already had a day job when he was laid off by Hardeman. He did not look for other work until he was laid off from his day job.[10] Respondents contend this demonstrates Spencer's night job at Hardeman was only "supplemental". Judge McLeod found that it was impossible to determine which job was "primary" and which "supplemental", and that it was just as plausible to assume that had Spencer lost his day job he would have been content to work at only his night job at Hardeman. Judge McLeod's determination is reasonable on the record before us; there is therefore substantial evidence to support the Board's decision that Spencer was entitled to back pay, with the computation being tolled during the period he worked at his day job. After he was laid off from his day job, Spencer diligently looked for other employment. The Board's order for back pay to Spencer is enforced, with the limitation set forth in Section III of this opinion.
 
 B. Margie Wilson
 
 37
 Margie Wilson's testimony was that she consistently applied for jobs from 1973 through 1980. Respondents contend her testimony showed that when she was employed during that period her efforts at working were half-hearted and that as a consequence she made herself unemployable.
 
 
 38
 Wilson explained the reasons she left each job where she was employed from 1973 through 1980. Judge McLeod credited her testimony, even though he found her answers were often "vague and indefinite." He noted Wilson is rural and uneducated and that the vagueness in her testimony was probably caused by these factors coupled with the difficulty of remembering events spreading over 8 years prior to the hearing. There is substantial evidence in the record to support the Board's order of back pay to Wilson; she made a "reasonable effort to mitigate damages." Westin Hotel, supra, at 1130.
 
 V. SUMMARY
 
 39
 The Board's order of back pay for the 17 discriminatees listed in footnote 4 is enforced in full. Respondents do not challenge those awards. The Board order of back pay for the 11 discriminatees listed in footnote 3 is only enforced through the mid-third quarter of 1974, when the Hardeman plant shut down. Any backpay award to the employees listed in footnote 3 beyond that quarter is denied enforcement.
 
 
 
 *
 The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 These individuals are called discriminatees because their discharge was motivated by an anti-union discriminatory animus
 
 
 [2]
 Apart from Master Slack the other named respondents are all, like Hardeman, wholly owned subsidiaries of Master Slack. Master Slack and the other subsidiaries were joined as defendants solely for purposes of the back pay awards. See NLRB v. Master Slack, 618 F.2d 6 (6th Cir.1980)
 
 
 [3]
 Earlie Cheairs, Ray Davis, Alma Jones, Nathaniel McClellan, Gladys McGowan, Doris McNeal, Wiley Murphy, Lurlene Pirtle, Willie Spencer, Ressie Ford Traylor, and Margie Wilson. Of these, Cheairs, Traylor, Pirtle, McNeal, McClellan, Jones, and Davis were rehired at various points in time from August, 1973 through May, 1974. However, they all lost their jobs when the Hardeman plant was shut down in the fall of 1974 and none of them were rehired when the plant reopened in 1975
 
 
 [4]
 Grace Beard, Mose Burkley, Peggy Peoples Harris, Freddie Jones, Mattie Jones, Earline Lake, Leroy Lake, Annie McKinnie, Percy McNeal, Donald Moss, Vera Norment, Juanita Phillips, Allan Lynn Russell, Johnny Russell, Leo Sain, Ernest Williams, and Patricia Williams
 
 
 [5]
 Willie Spencer and Margie Wilson, 2 of the 11 discriminatees listed in footnote 3, supra
 
 
 [6]
 This section states that it shall be an unfair labor practice for an employer to "discriminat[e] in regard to hire or tenure of employment of any term or condition of employment to encourage or discourage membership in any labor organization."
 
 
 [7]
 Sec. 8(a)(1) states that it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights [to organize and participate in labor organizations]"
 
 
 [8]
 In Migra v. Warren City School District Board of Education, 465 U.S. 75, 104 S.Ct. 892, 894 n. 1, 79 L.Ed.2d 56 (1984), the United States Supreme Court discussed the confusing variance in terminology surrounding the concept of preclusion:
 "The preclusive effects of former adjudications are discussed in varying and, at times, seemingly conflicting terminology.... These effects are referred to by most commentators as the doctrine of 'res judicata'. Res judicata is often analyzed further to consist of two preclusion concepts: 'issue preclusion' and 'claim preclusion'. Issue preclusion refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided. This effect also is referred to as direct or collateral estoppel. Claim preclusion refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit....
 This Court on more than one occasion has used the term 'res judicata' in a narrow sense, so as to exclude issue preclusion or collateral estoppel. When using that formulation, 'res judicata' becomes virtually synonymous with 'claim preclusion'. In order to avoid confusion resulting from the two uses of 'res judicata', this opinion utilizes the term 'claim preclusion' to refer to the preclusive effect of a judgment in foreclosing relitigation of matters that should have been raised in an earlier suit."
 In this case the parties and the Board all referred generally to the doctrine of "res judicata" even though the problem here is one of issue preclusion rather than claim preclusion. For the sake of clarity this court will follow the lead of the Supreme Court. Accordingly, the term "issue preclusion" will be used throughout this opinion in discussing whether respondent is foreclosed from relitigating issues decided in the prior unfair labor practices proceeding.
 
 
 [9]
 Had the Board found that anti-union animus in violation of Sec. 8(a)(3) had been the cause of the plant shutdown it could have awarded backpay extending past the plant shutdown not only to employees illegally discharged prior to the shutdown but to all the employees at the plant. See NLRB v. National Car Rental System, Inc., 672 F.2d 1182, 1191 (3d Cir.1982); Electrical Products Division of Midland-Ross Corp. v. NLRB, 617 F.2d 977 (3d Cir.1980), cert. den. 449 U.S. 871, 101 S.Ct. 210, 66 L.Ed.2d 91 (1980)
 
 
 [10]
 The record does not contain the date when Spencer was laid off from his day job