**KAWASAKI MOTORS MANUFACTUR-ING CORPORATION, U.S.A.,**
Petitioner, Cross–Respondent,

v.

**NATIONAL LABOR RELATIONS BOARD**, Respondent,
Cross–Petitioner,

International Union, United Automobile, Aerospace and Agriculture Implement Workers of America (UAW), Respondent–Intervenor.

Nos. 87–7122, 87–7177.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 5, 1988.

Decided June 22, 1988.

William B. Stewart, Washington, D.C., for petitioner, cross-respondent.

Charles Sykes, Houston, Tex., for respondent, cross-petitioner.

Stanley Eisenstein, Chicago, Ill., for respondent-intervenor.

Before TANG, FLETCHER and PREGERSON, Circuit Judges.

PREGERSON, Circuit Judge:

The National Labor Relations Board (NLRB) ordered Kawasaki Motors Manufacturing Corporation, U.S.A. (Kawasaki) to compensate Daniel Bennett (Bennett) for earnings lost because Kawasaki unlawfully fired Bennett. The NLRB's order of November 17, 1986, as corrected by its order of February 3, 1987, specifies the amount of backpay Kawasaki owes Bennett. Kawasaki petitions this court to review and set aside the NLRB's order of November 17, 1986, alleging that the backpay award is not supported by substantial evidence and that the NLRB violated its own rules and regulations in determining the amount of the award. The NLRB asks this court to enforce the NLRB's order. We affirm the NLRB's findings and enforce its November 17, 1986 order, as that order is corrected by the February 3, 1987 order.

## I

## BACKGROUND

On April 10, 1979, Kawasaki unlawfully fired Daniel Bennett in violation of section 8(a)(1), (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (3) (1982). Before his termination, Daniel Bennett's record of service to Kawasaki was described as "outstanding," "commendable," and "superior." Kawasaki acknowledged the quality of Bennett's work by giving him three raises during the year or so before it fired him.

Daniel Bennett was also a union supporter. When Bennett was fired, Kawasaki's Lincoln, Nebraska facility was in the middle of an increasingly heated union campaign. An election was imminent. Bennett actively promoted the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW). He wore union T-shirts and buttons, talked to other employees about union representation, and served on the union's organizing committee.

One day close to the election—after working eight hours from 5:00 p.m. to approximately 1:00 a.m.—Bennett sat down to take a break. He found a Reader's

Digest and opened it to the section entitled "Laughter—The Best Medicine." Bennett's supervisor "caught" Bennett reading, and reprimanded him for resting on the job. Kawasaki fired Bennett the next afternoon on the ground that Bennett's supervisor "could no longer trust him."

The NLRB determined that Kawasaki's reason for firing Bennett was pretextual. While the ALJ found that perusing Reader's Digest on the job arguably could justify a "mild rebuke," he did not see how it could shake Kawasaki's confidence in Bennett. Termination seemed out of proportion to the transgression. The ALJ concluded that "Bennett was subjected to summary, harsh discipline because of a desire by [Kawasaki] to rid itself of [Bennett's] union activism shortly before the election." *Kawasaki Motors Corporation, U.S.A.,* 257 N.L.R.B. 502, 516 (1981), *enforced,* 691 F.2d 507 (9th Cir.1982), *cert. denied,* 459 U.S. 1202, 103 S.Ct. 1186, 75 L.Ed.2d 433 (1983).

On August 3, 1981, the NLRB ordered Kawasaki to "make [Bennett] whole for lost earnings" resulting from his unlawful discharge. *Id.* at 520. We denied Kawasaki's petition for review and enforced the NLRB's order. *Kawasaki Motors Corporation, U.S.A. v. NLRB,* 691 F.2d 507 (9th Cir.1982), *cert. denied,* 459 U.S. 1202, 103 S.Ct. 1186, 75 L.Ed.2d 433 (1983).

The parties could not agree on the amount of backpay Kawasaki owed Bennett. Accordingly, the NLRB's Regional Director issued a backpay specification[1] and a notice of hearing for a backpay proceeding pursuant to 29 C.F.R. § 102.52 (1987). Kawasaki denied all pertinent allegations of the backpay specification and proposed its own backpay formula.

The initial backpay hearing was held on November 8–10, 1983. After the hearing, the General Counsel filed an amended backpay specification. The administrative law judge (ALJ) issued a supplemental decision on January 30, 1985. Kawasaki filed exceptions.

In January 1986, the NLRB remanded the case for the ALJ to take additional evidence on two issues: (1) the appropriate formula for computing overtime, and (2) whether Bennett would have received a promotion during the backpay period had he not been discriminatorily discharged for union activities, and, if so, the date of the promotion and the rate of pay he would have received.

Additional ALJ hearings were held in February and March 1986. The General Counsel moved to amend the backpay specification again to reflect its view that Bennett would have been promoted on August 1, 1979. The ALJ issued a second supplemental decision recommending that Bennett be awarded backpay from the date of his discharge to the date of Kawasaki's reinstatement offer. The ALJ found Bennett would have been promoted on August 1, 1979. He also made findings regarding the proper method of calculating overtime backpay.

On November 17, 1986, the NLRB issued a Supplemental Decision and Order substantially affirming the rulings, findings, and conclusions of the ALJ and adopting the ALJ's recommended order with minor modifications. On February 3, 1987, the NLRB clarified its order, indicating that interest would be added to net backpay and that Bennett remains entitled to a promotion. The NLRB stated that the amount of backpay will remain open until Bennett

1. After the NLRB orders an employer to pay backpay to a wrongfully discharged employee, the Regional Director decides whether a formal proceeding will be required to resolve the amount owed. If it appears that the parties will dispute the amount of backpay owed to the employee, the Regional Director may issue a document called a "backpay specification" and call for an ALJ hearing. The backpay specification sets forth in detail the backpay periods, specific figures regarding the gross amount due, earnings and expenses for each quarter, net backpay due, and other pertinent information. The employer must file an answer to the specification admitting, denying, or explaining each allegation of the specification. If the employer fails to file an answer, the NLRB may find that the specification is true and award backpay accordingly. The NLRB's rules and regulations regarding backpay pleadings and proceedings are set forth at 29 C.F.R. §§ 102.52 to .59 (1987) ("Backpay Proceedings").

is actually offered the promotion to which he is entitled.

## II

## DISCUSSION

Kawasaki makes five specific complaints, which we will address in turn. It contends that the NLRB's backpay award should be reduced because: (1) Bennett's search for work was not adequately diligent during a twenty-one week period of unemployment; (2) Bennett incurred a willful loss of earnings by voluntarily terminating interim employment; (3) Bennett concealed interim earnings from the NLRB; (4) the NLRB violated its own rules and regulations by belatedly considering the issue of whether Bennett would have been promoted had Kawasaki not unlawfully terminated him; and (5) Bennett would not have been promoted on August 1, 1979, as the NLRB concluded.

■ Before addressing Kawasaki's contentions, we note that the NLRB's backpay orders are subject to only limited judicial review. The NLRB has broad discretionary authority to award backpay to remedy unfair labor practices. *NLRB v. J. H. Rutter-Rex Mfg. Co.,* 396 U.S. 258, 262–63, 90 S.Ct. 417, 419–20, 24 L.Ed.2d 405 (1969). We give considerable deference to the NLRB's exercise of its discretion. *Sure-Tan, Inc. v. NLRB,* 467 U.S. 883, 898–99, 104 S.Ct. 2803, 2812, 81 L.Ed.2d 732 (1984); *Alfred M. Lewis, Inc. v. NLRB,* 681 F.2d 1154, 1156 (9th Cir.1982). Findings of fact in a backpay proceeding will be upheld as long as they are supported by substantial evidence, considering the record as a whole. *NLRB v. United Bhd. of Carpenters & Joiners of America, Local 1913,* 531 F.2d 424, 426 (9th Cir.1976).

■ In a backpay proceeding, the General Counsel's burden is to show only the gross amount of backpay due a claimant. *See M Restaurants, Inc. v. NLRB,* 621 F.2d 336, 337 (9th Cir.1980). Once that is done, the burden shifts to the employer to establish facts that would reduce that amount. *Id.* Thus, Kawasaki bore the burden of proving the factual issues war-

ranting a reduction of the gross amount of backpay. This is a difficult burden because doubts must be resolved against the employer who committed the unfair labor practice. *NLRB v. Madison Courier, Inc.,* 472 F.2d 1307, 1321 (D.C.Cir.1972); *NLRB v. Miami Coca–Cola Bottling Co.,* 360 F.2d 569, 572–73 (5th Cir.1966). *Cf. Alfred M. Lewis, Inc.,* 681 F.2d at 1157 ("the employer should not be allowed to benefit from the uncertainty caused by its discrimination").

### 1. Bennett's Search for Work

Kawasaki first argues that its liability for the gross amount of backpay should be reduced because Bennett's search for work was not sufficiently diligent during the twenty-one week period between July and December 1981. Kawasaki alleges that Bennett applied to only six employers during that period, and that newspaper advertisements and hiring records indicated that many jobs performable by Bennett were available.

■ A wrongfully discharged employee is required to make only a reasonable effort to obtain interim employment, and is not held to the highest standard of diligence. *Iron Workers Local 118 v. NLRB,* 804 F.2d 1100, 1102 (9th Cir.1986); *NLRB v. Westin Hotel,* 758 F.2d 1126, 1130 (6th Cir.1985). Success or failure in securing interim employment is not a measure of the sufficiency of the employee's search; the law requires only an "honest good faith effort." *Canova v. NLRB,* 708 F.2d 1498, 1506 (9th Cir.1983) (citations omitted). Because the ultimate test of the employee's efforts is whether they are consistent with the inclination to work and to be self-supporting, we approve the NLRB's policy of looking to the backpay period as a whole and not at isolated portions of that period. *See, e.g., Sioux Falls Stock Yards Co.,* 236 N.L.R.B. 543, 551 (1978); *Saginaw Aggregates, Inc.,* 198 N.L.R.B. 598, 598 (1972).

■ The NLRB found that Bennett's search for jobs from July to December 1981 was sufficiently diligent. Bennett was not found to have "willfully incurred"

a loss of earnings by demonstrating a "clearly unjustifiable refusal to take desirable new employment." *Phelps Dodge Corp. v. NLRB,* 313 U.S. 177, 198–200, 61 S.Ct. 845, 854–55, 85 L.Ed. 1271 (1941). Kawasaki fails to show that the NLRB's finding regarding Bennett's diligence lacks the support of substantial evidence.

First, Kawasaki's statement that Bennett applied to only six employers during the twenty-one week period discounts the fact that the ALJ credited Bennett's testimony that he applied to more than six employers. When reviewing a decision of the NLRB, this court gives special weight to the credibility determinations made by the ALJ. The ALJ's findings will not be disturbed unless a clear preponderance of the evidence indicates that the findings are incorrect. *General Teamsters Local No. 162 v. NLRB,* 782 F.2d 839, 842 (9th Cir.1986). We do not find a clear preponderance of the evidence that would lead us to reject the ALJ's credibility determination.

Second, the record reflects that Bennett's actions during the backpay period as a whole demonstrate diligence. Bennett applied to at least fifty employers during the overall backpay period, and he never refused an interview set up by a governmental employment agency. Bennett was also gainfully employed for the bulk of the backpay period. Finally, Bennett received Railroad Retirement benefits during the period in question, which were conditioned on the requirement that he diligently search for employment. The Railroad Retirement Board never denied Bennett benefits for lack of diligence.

Kawasaki's reliance on newspaper advertisements and hiring records to show the availability of jobs is not adequately convincing. Kawasaki failed to produce evidence of employment specifically available or employment offers Bennett refused to accept.

Given the ALJ's credibility determination that Bennett applied to more than six employers during the period in question; Bennett's diligence during the backpay period as a whole; and Kawasaki's failure to produce specific evidence indicating a lack of diligence, we find the NLRB's determination that Bennett was diligent in his search for employment to be supported by substantial evidence.

### 2. Bennett's Decision to Leave Fremont Computer

After Kawasaki unlawfully terminated Bennett, he held several jobs, including one with Fremont Computer. Kawasaki argues that its liability for the gross amount of backpay should be reduced because Bennett incurred a willful loss of earnings when he voluntarily left his job with Fremont Computer. The ALJ found that Bennett left Fremont Computer because his work there involved onerous conditions beyond Bennett's control. Kawasaki challenges that finding and the ALJ's credibility determinations supporting it.

■ We agree with those circuits that hold a wrongfully discharged employee is expected to seek only new employment that is substantially equivalent to the position lost. *See, e.g., Westin Hotel,* 758 F.2d at 1130; *Madison Courier,* 472 F.2d at 1320–21. The employee is not required to seek or retain a job more onerous than the job from which he or she was discharged. *See, e.g., Madison Courier,* 472 F.2d at 1320–21.

■ Substantial evidence shows that Bennett's job at Fremont Computer was more onerous than his job at Kawasaki. At Kawasaki, Bennett worked the 3:00 p.m. to 11:00 p.m. shift, which allowed him to take college courses during the day. Although Fremont Computer originally assigned Bennett to a similar shift, they later reassigned him to a 9:00 p.m. to 5:00 a.m. shift and asked him to work overtime. Bennett and his supervisor both testified that Bennett often worked fifty to sixty hours per week. Bennett's all-night schedule and extended hours prevented him from continuing his education. The ALJ found credible testimony that Bennett quit because he was "burned out" and frustrated by his inability to take classes.

Kawasaki argues that Bennett's interest in taking college courses somehow invali-

dates his right to leave a more onerous job. This line of argument avoids the obvious fact that Bennett's job at Fremont Computer was more burdensome than his job at Kawasaki. Bennett had the right to leave more onerous employment regardless of how he chose to spend his non-working hours.

Kawasaki also alleges that Fremont Computer eliminated the overtime burden by hiring an extra employee before Bennett quit. Kawasaki therefore argues that Bennett no longer had the right to quit. Bennett's supervisor at Fremont Computer testified that he was not sure whether Bennett's overtime situation had in fact improved. After considering the testimony on this issue, the ALJ decided that Bennett was telling the truth when he stated that his situation at Fremont Computer had not improved and that the extra employee placed new training demands on Bennett rather than lightened his workload. We do not find a clear preponderance of evidence that would lead us to reject the ALJ's credibility determinations. *See General Teamsters Local No. 162*, 782 F.2d at 842.

The cases that Kawasaki cites in arguing that Bennett incurred a willful loss of earnings by quitting his job at Fremont and not seeking similar employment are all distinguishable on their facts. In none of Kawasaki's cases did an employee quit an interim job because of unduly burdensome working conditions. *See McCann Steel Co. v. NLRB*, 570 F.2d 652, 655 (6th Cir. 1978) (employee refused to work same number of hours he previously had worked); *NLRB v. Avon Convalescent Center, Inc.*, 549 F.2d 1080, 1081 (6th Cir. 1977), *reversing in part* 219 N.L.R.B. 1210 (1975) (claimant did not register with employment agency for referrals and did not apply for any jobs equivalent to the one she held when she was unlawfully discharged); *Big Three Industrial Gas & Equip. Co.*, 263 N.L.R.B. 1189, 1218–19 (1982) (employee admittedly abandoned his search for work in areas relevant to his prior work experience, and instead toured with a musical band for minimal wages and personal enjoyment); *Shell Oil Co.*, 218 N.L.R.B. 87, 90 (1975), *aff'd, Weitzel v. NLRB*, 551 F.2d 314 (9th Cir.), *cert. denied*, 434 U.S. 920, 98 S.Ct. 394, 54 L.Ed.2d 277 (1977) (employee feared excessive overtime but, in fact, never worked more than a forty-hour week); *Knickerbocker Plastic Co., Inc.*, 132 N.L.R.B. 1209, 1214–15 (1961) (employee quit jobs that were no more burdensome than job from which employee was wrongfully discharged). We therefore find the NLRB's determination that Bennett justifiably terminated his employment at Fremont Computer to be supported by substantial evidence.

### 3. Bennett's Unexplained Deposits

Kawasaki also contends that its liability for the gross amount of backpay should be reduced because Bennett was unable to recall four years later the source of five deposits totaling approximately $1,500.

In *American Navigation Co.*, 268 N.L.R.B. 426 (1983), the NLRB held that it would deny backpay for quarters in which a claimant was found to have willfully concealed from the NLRB interim employment earnings. The NLRB also held, however, that this rule would "of course" not apply "where the claimant, through *inadvertence*, fails to report earnings." *Id.* at 428 (emphasis added). The NLRB placed primary responsibility for distinguishing honest error from deceit with the administrative law judge. *Id.* at 428 n. 7.

Kawasaki argues that Bennett's failure to account for the money in question represents deceit. It also argues that the record as a whole supports the inference that Bennett was depositing unreported earnings from interim employment.

The ALJ disagreed with Kawasaki. He observed that "it is more normal than not that an individual in Bennett's situation failed to maintain or retain records concerning his limited financial transactions." After hearing testimony and considering the possibility that this money could have been termination pay, unemployment compensation, gift, or any combination of the above, the ALJ concluded that "I am not

persuaded that any of the deposits represent interim earnings."

Kawasaki failed to present any evidence that would lead us to alter the ALJ's characterization of the deposits. Kawasaki refers to alleged inconsistencies between the backpay specifications filed by the General Counsel and Bennett's social security records and income tax returns. We are not convinced that any inconsistencies exist because Kawasaki fails to consider in its calculations the full range of monies—including National Guard earnings and Railroad Retirement benefits—that could have been included in Bennett's records and returns, and excluded from the backpay specifications. We therefore find the NLRB's determination that Bennett did not conceal earnings to be supported by substantial evidence.

### 4. The Procedural Validity of Considering Bennett's Right to a Promotion

Kawasaki's fourth contention is that the NLRB violated its own rules and regulations by considering the question whether Bennett would have been promoted had he not been unlawfully discharged. The NLRB found that Bennett would have been promoted, and therefore that some of his backpay should be calculated at the higher rate that would have accompanied a promotion.

■ The essence of Kawasaki's procedural complaint is that the issue of a promotion was not timely raised. The General Counsel did not mention the possibility of a promotion until the last day of the initial backpay hearing. The promotion rate of pay was not included in the first two backpay specifications filed by the NLRB compliance officer. In fact, the promotion rate was not included in the backpay specification until the ALJ allowed the General Counsel to submit a third amended specification.

Kawasaki contends that the ALJ's leniency towards the General Counsel on the promotion issue contradicts the NLRB's generally strict approach to backpay specifications. Kawasaki notes that the NLRB's rules and regulations require a detailed and specific backpay specification and a verified and detailed answer to the backpay specification. *See generally* 29 C.F.R. §§ 102.52 to .59 (1987) ("Backpay Proceedings"). Kawasaki also cites instances where the NLRB has held employers and the General Counsel to the defenses and allegations asserted in their original pleadings. *See, e.g., Airports Serv. Lines, Inc.,* 231 N.L.R.B. 1272, 1272–73 (1977), *enforced,* 589 F.2d 1115 (D.C.Cir.1978) (NLRB approves ALJ's refusal in a backpay proceeding to consider evidence of an affirmative defense not raised in the employer's answer to the backpay specification); *Barkman Contracting, Inc.,* 276 N.L.R.B. 1062, 1062 n. 3 (1985) (NLRB approves ALJ's refusal to grant General Counsel's "nonspecific" request that backpay pleadings be amended to conform to the proof offered at hearing).

Kawasaki is correct in noting that the NLRB's rules and regulations emphasize detailed accuracy in backpay specifications. Kawasaki fails, however, to provide us with any rules, regulations, or cases that prohibit the NLRB from allowing the General Counsel to amend its backpay specification. To the contrary, the NLRB's rules and regulations explicitly authorize the amendment of backpay specifications "upon leave of the administrative law judge or of the Board, as the case may be." 29 C.F.R. § 102.57 (1987). Although we agree that the General Counsel should have raised the promotion issue in a more timely manner, we find that Kawasaki was not prejudiced by the delay.

■ Kawasaki's recitation of the promotion issue's procedural history tells only half the story. In the ALJ's first supplemental decision, he found it reasonable to assume that Bennett would have been promoted but for the unlawful termination. Kawasaki filed exceptions to this factual finding, but did not assert that the matter was not properly at issue. The NLRB ordered a second ALJ hearing to resolve the question of when Bennett would have been promoted. Again, Kawasaki filed no procedural challenges to this order. At the ALJ

hearing on the promotion issue, Kawasaki initially began to argue the merits of the issue. It was not until the second day of the promotion hearing that Kawasaki raised any procedural objections.

The NLRB concluded that Kawasaki's responses to the merits of the promotion issue estopped it from raising procedural arguments. We find that the NLRB's holding was reasonable, both in light of its previous cases and the equities of this case. *See, e.g., Clear Pine Mouldings, Inc.*, 268 N.L.R.B. 1044, 1044 nn. 2, 4 (1984), *enforced*, 765 F.2d 148 (9th Cir.1985), *cert. denied*, 474 U.S. 1105, 106 S.Ct. 893, 88 L.Ed.2d 926 (1986) (where General Counsel failed to object at the backpay hearing to evidence that introduced a new issue and effectively altered an employer's answer to the backpay specification, General Counsel estopped from raising procedural objections before the NLRB). The NLRB set a special hearing specifically to address the promotion question after it was raised. Kawasaki had the opportunity at two hearings to object to the introduction of a new issue or to litigate it. Kawasaki initially chose to litigate. Under these circumstances, Kawasaki is estopped from later raising procedural complaints.

### 5. The Likelihood that Bennett Would Have Been Promoted

■ Kawasaki finally complains that the NLRB's factual finding regarding when Bennett would have been promoted is not supported by substantial evidence. The NLRB found that Bennett would have been promoted on August 1, 1979 if Kawasaki had not unlawfully terminated him. The ALJ arrived at that date by determining that John Kitrell had been hired for an advanced position that Bennett would have been more qualified to fill. Kawasaki challenges this determination by arguing that Kitrell was more qualified than Bennett.

The key difference between the ALJ's finding and the position argued by Kawasaki has to do with Kitrell's work experience. By interpreting Kitrell's background one way, the ALJ determined that Kitrell had less experience than Bennett. Kawa-

saki reads Kitrell's background differently, and concludes that Kitrell had more experience than Bennett. Under Kawasaki's hiring policies, work experience is an important factor in promotions and hiring.

We agree with Kawasaki that there is some doubt as to (1) how Bennett's experience would have compared to Kitrell's experience had Bennett not been unlawfully discharged, and (2) whether Bennett would have been given the position Kitrell obtained. These doubts, however, are a result of the fact that Kawasaki unlawfully discharged Bennett. Kawasaki—not Bennett—placed the ALJ, the NLRB, and now this court in the position of having to resolve doubts about the date Bennett would have been promoted. Because "the employer should not be allowed to benefit from the uncertainty caused by its discrimination," *Alfred M. Lewis, Inc.*, 681 F.2d at 1157, we hold that doubts concerning when an unlawfully discharged employee would have been promoted should be resolved against the employer.

Accordingly, we find the ALJ's determination that Kitrell had less experience than Bennett to be supported by substantial evidence. We therefore also find the NLRB's determination that Bennett would have been promoted on August 1, 1979 to be supported by substantial evidence.

### III

### CONCLUSION

We find that the NLRB's order of November 17, 1986, as corrected by its order of February 3, 1987, is supported by substantial evidence and free from procedural error.

**PETITION FOR REVIEW DENIED AND ENFORCEMENT GRANTED.**