983 F.2d 705
 142 L.R.R.M. (BNA) 2290, 124 Lab.Cas. P 10,519,
124 Lab.Cas. P 10,604
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
Highway & Local Motor Freight Employees Local Union No. 667,
Intervenor,
v.
RYDER SYSTEM, INC.; Ryder Distribution Systems, Inc.; DPD,
Inc.; and Ryder Distribution Resources, Inc., Respondents.
 No. 91-6391.
 United States Court of Appeals,
Sixth Circuit.
 Argued Aug. 3, 1992.
Decided Jan. 8, 1993.
 
 Aileen A. Armstrong, Deputy Associate Gen. Counsel, Collis Suzanne Stocking, Magdalena Revuelta (argued and briefed), N.L.R.B., Office of the General Counsel, Washington, DC, Gerald P. Fleischut, Director, N.L.R.B., Region 26, Memphis, TN, for petitioner.
 James Wallington, Washington, DC, for intervenor.
 William L. Sossaman, Richard H. Allen, Jr. (argued and briefed), Allen, Scruggs, Sossaman & Thompson, Memphis, TN, for respondents.
 Before: NELSON and RYAN, Circuit Judges; and CONTIE, Senior Circuit Judge.
 RYAN, Circuit Judge.
 
 
 1
 This appeal is the latest, and hopefully the last, chapter in the nearly decade-long struggle between respondent Ryder System, Inc. and members of a Teamsters local, intervenor Highway and Local Motor Freight Employees Local Union No. 667. The case arose when Ryder unlawfully refused to hire members of Local 667 in 1983. Although over thirty truckdrivers were originally involved in the dispute, the present appeal before this court involves only two.
 
 
 2
 Petitioner National Labor Relations Board applies to this court to enforce an order of the Board determining the amount of backpay due to the two remaining employees, Larry Elmore and Carl Briscoe. The backpay order was itself a supplemental order, issued pursuant to the earlier finding that Ryder had engaged in an unfair labor practice when it refused to hire the members of Teamsters Local 667.
 
 
 3
 After consideration of the numerous issues raised by Ryder, we grant the Board's application and enforce its order.
 
 I.
 
 4
 Diesel Recon Company is a Memphis firm that manufactures engines. Until December 1983, it used its own truckdrivers to transport its products. Diesel Recon drivers were members of Local 667 and earned between $600 and $900 per week.
 
 
 5
 Ryder contracts with companies to provide transportation services which include both trucks and drivers. In December 1983, Ryder contracted with Diesel Recon to satisfy Diesel Recon's shipping needs, after which Diesel Recon laid off all its drivers. Ryder then hired eight former Diesel Recon drivers, but refused to hire thirty-two others. Ryder filled the remainder of the initial complement of drivers needed for its new Diesel Recon account by transferring existing Ryder employees from another account, obtaining drivers "off the street," and bringing applicants in from out of town. The two drivers who are the subject of the Board's order that Ryder now appeals--Larry Elmore and Carl Briscoe--were part of the group of former Diesel Recon drivers Ryder refused to hire.
 
 
 6
 In August 1985, an Administrative Law Judge held that Ryder's refusal to hire the thirty-two drivers was an unfair labor practice because the decision was based on the fact that the drivers supported Teamsters Local 667, a violation of section 8(a)(3) and (1) of the National Labor Relations Act, 29 U.S.C. § 151 et seq. In 1986, the Board adopted the ALJ's order. Ryder System, Inc., 280 N.L.R.B. 1024 (1986) (Ryder System I ). In 1988, this court, in an unpublished decision, enforced the Board's order. NLRB v. Ryder System Inc., 842 F.2d 332 (reported in table) (6th Cir.1988).
 
 
 7
 Subsequently, the Board commenced a backpay proceeding, during the course of which Ryder settled with many, but not all, the drivers. In 1990, an ALJ issued a decision recommending that the seven discriminatees who had not settled be awarded backpay, and determining the amount of backpay due. Ryder filed exceptions to this order, and the Board reviewed it. Before the Board completed its review, five of the remaining seven drivers settled with Ryder, leaving only the cases of Elmore and Briscoe. In 1991, the Board adopted the recommended supplemental order determining the amount of backpay Ryder owed Elmore and Briscoe. Ryder System, Inc., 302 N.L.R.B. No. 93 (April 19, 1991) (Ryder System II ).
 
 
 8
 In November 1991, the Board applied to this court for enforcement of its April 1991 supplemental order. Ryder opposed the Board's application, raising numerous issues. Two issues relate only to Larry Elmore:
 
 
 9
 1. Whether Ryder's hiring of Elmore in October 1985 was a sufficient reinstatement to toll backpay liability; and
 
 
 10
 2. Whether Ryder's subsequent discharge of Elmore after it hired him constituted a willful loss of earnings on the part of Elmore?
 
 Two issues relate only to Carl Briscoe:
 
 11
 1. Whether Briscoe incurred a willful loss of earnings when he left one job and waited one month before starting another; and
 
 
 12
 2. Whether Briscoe incurred a willful loss of earnings by removing himself from the relevant labor market when he started working as a painter and stopped looking for work as a truckdriver?
 
 One issue relates to both drivers:
 
 13
 Whether Elmore and Briscoe incurred a willful loss of earnings when they left jobs as truckdrivers to take jobs as freighthandlers?
 
 
 14
 We conclude that the Board acted within its discretion, and we enforce the Board's order in its entirety.
 
 II.
 RYDER'S BACKPAY LIABILITY TO ELMORE
 A.
 Background
 
 15
 Elmore began working for Diesel Recon in June 1975, and was number two on the seniority list when he was laid off on December 3, 1983, after Ryder assumed Diesel Recon delivery operations. In the weeks prior to taking over Diesel Recon's operation, Ryder accepted applications from Diesel Recon drivers. Although most drivers had applied by December 3, 1983, Elmore had not; he was out on a run and did not return to Memphis until December 4, at which time he filed an application with Ryder. Ryder refused to hire him.
 
 
 16
 After the layoff by Diesel Recon and Ryder's subsequent rejection of his application, Elmore compiled an erratic employment record. Between December 1983 and October 1985, he worked for four different trucking companies. In October 1985, during the course of the unfair labor practice proceedings arising from Ryder's initial refusal to hire, Ryder hired Elmore as a casual driver; after a probationary period, he became a full-time driver at the bottom of Ryder's seniority list.
 
 
 17
 In March 1987, Elmore was discharged by Ryder for insubordination arising from an encounter between Elmore and Ryder's operations manager. The NLRB filed an unfair labor practice charge against Ryder because of this discharge, but in September 1988 an ALJ found that the discharge was lawful. The full Board adopted this recommendation in November 1988.
 
 
 18
 Meanwhile, the backpay proceedings arising from the 1983 refusal to hire were moving to conclusion. In June 1990, the ALJ found that Elmore was due $26,024.83 in interim backpay from December 4, 1983 until March 18, 1987. The ALJ also concluded that Elmore was entitled to a reinstatement despite the Board's finding that the March 1987 discharge was lawful. Finally, the ALJ held that Elmore was due additional backpay for the period from March 18, 1987 until his reinstatement by Ryder. In Ryder System II, the Board adopted the supplemental decision and order.
 
 B.
 Statutory Scheme and Standard of Review
 
 19
 We approach this case mindful that Congress has chosen to vest the NLRB with considerable discretion. Section 10(c) of the NLRA authorizes the NLRB to order reinstatement and backpay. It empowers the Board, after finding that an employer has committed an unfair labor practice, to issue an order requiring the employer
 
 
 20
 to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter: Provided, That where an order directs reinstatement of an employee, back pay may be required of the employer ... responsible for the discrimination suffered by him....
 
 
 21
 29 U.S.C. § 160(c). The statute also establishes the relevant standard of review courts shall employ: "The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e).
 
 
 22
 The Supreme Court has firmly established that section 10(c) grants the Board wide latitude to remedy unfair labor practices. In NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Court held:
 
 
 23
 In fashioning its remedies under the broad provisions of § 10(c) of the Act, the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts.
 
 
 24
 Id. at 612 n. 32, 89 S.Ct. at 1939 n. 32 (citations omitted). The Court reiterated this principle in Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984), holding:
 
 
 25
 The Court has repeatedly interpreted [section 10(c) ] as vesting in the Board the primary responsibility and broad discretion to devise remedies that effectuate the policies of the Act, subject only to limited judicial review. Although the courts of appeals have power under the Act "to make and enter a decree ... modifying, and enforcing as so modified" the orders of the Board, they should not substitute their judgment for that of the Board in determining how best to undo the effects of unfair labor practices[.]
 
 
 26
 Id. at 898-99, 104 S.Ct. at 2812 (quoting 29 U.S.C. § 160(e)) (citations omitted). This court has held that the Board possesses broad discretionary authority in awarding backpay as a remedy, and the exercise of this discretion is subject to limited judicial scrutiny. NLRB v. Westin Hotel, 758 F.2d 1126, 1129 (6th Cir.1985). This court does not disturb an ALJ's finding unless a clear preponderance of the evidence indicates that the findings are incorrect. Kawasaki Motors Mfg. Corp., USA v. NLRB, 850 F.2d 524, 538 (9th Cir.1988). In addition, the Board possesses substantial discretion in the reinstatement of employees. David R. Webb Co. v. NLRB, 888 F.2d 501, 510 (7th Cir.1989), cert. denied, 495 U.S. 956, 110 S.Ct. 2560, 109 L.Ed.2d 743 (1990).
 
 C.
 Ryder's 1985 Hiring of Elmore
 
 27
 Ryder strenuously argues that when it hired Elmore in October 1985, it reinstated him. Therefore, it fulfilled its obligations under the original order and does not owe backpay for any time after October 1985, including the time after it lawfully discharged Elmore in March 1987; nor does it have a continuing obligation to rehire Elmore.
 
 
 28
 The original 1985 decision of the ALJ, adopted by the Board and enforced by this court, required Ryder to take the following action:
 
 
 29
 Offer each individual named in footnote 3 of this decision [the 32 drivers Ryder refused to hire in December 1983] full reinstatement to his former position as a full-time over-the-road truckdriver in their Diesel Recon account at their Memphis, Tennessee location, except those who have already been so reinstated or, if such position no longer exists, to a substantially equivalent position, without prejudice to his seniority or other rights and privileges, dismissing, if necessary, any employee hired to fill such position.
 
 
 30
 Ryder System I, 280 N.L.R.B. at 1054. After the ALJ issued his decision in August 1985, but before it was adopted by the full Board and later enforced by this court, Ryder hired Elmore. This occurred in October 1985. Importantly, Ryder employed Elmore in a probationary position, and when he worked his way out of probation he was placed last on the seniority list.
 
 
 31
 The supplemental ALJ decision of June 1990 held that the October 1985 hiring did not toll backpay liability because Elmore was not rehired with his accumulated seniority. Ryder argued below that the original decision did not require it to give Elmore the same seniority he enjoyed before the December 1983 lay off. In response, the Board held:
 
 
 32
 Under the underlying Order, the Respondents were required to offer Elmore reinstatement to his former driver position or, if that position did not exist, to "a substantially equivalent position without prejudice to his seniority or other rights and privileges...." Elmore had originally been ranked second in seniority among drivers in the division in question; thus, when the Respondents hired him in October 1985 as a casual driver without seniority ranking, the Respondents did not thereby offer the reinstatement to which Elmore was entitled under the Order.
 
 
 33
 Ryder System II, 302 N.L.R.B. No. 93, slip op. at 4 (quoting Ryder System I, 280 N.L.R.B. at 1054).
 
 
 34
 Ryder does not dispute that it did not give Elmore his former seniority rank--number two--when it hired him in October 1985. Ryder claims, however, that it was not required to do so, and advances several arguments in support of its position. We think they are not well-taken.
 
 
 35
 First, Ryder contends that although Elmore lacked his former seniority ranking during his period of employment with Ryder, he earned more money than the driver who was ranked number two during that period. The ALJ held that this arose from Elmore's good fortune of teaming with a senior driver who selected him as a driving partner. "As a result, Elmore had earnings derived from his partner's seniority that were higher than they might have been had he been placed in a position of personally selecting runs while at the bottom of the seniority roster." The ALJ further held that "this happenstance does not absolve the Respondent from its ongoing obligation of placing Elmore" into his former seniority standing. The Board adopted this finding, holding that although Elmore had comparable earnings during his period of employment with Ryder, he did not receive his former seniority, and thus was not sufficiently reinstated. We conclude that in so holding, the Board acted within its discretion.
 
 
 36
 Second, Ryder argues that the original order only required it to hire Elmore as a full-time truckdriver, which it did in October 1985, and did not require it to give Elmore his former seniority.[1] Ryder relies on the language of the order that it must offer full reinstatement to every laid-off truckdriver "except those who have already been so reinstated...." Ryder claims that since it hired Elmore in October 1985, well before the Board's adoption of the ALJ's decision in June 1986, Elmore was already "reinstated." Thus, Ryder would have this court conclude that the language of the order "without prejudice to his seniority" does not apply to already-hired truckdrivers.
 
 
 37
 Ryder's interpretation of the original order is not persuasive. Giving the order what we think is a logical reading, we conclude that it required Ryder to reinstate all drivers with their former seniority. The Board has interpreted this, its own order, as requiring Ryder to reinstate Elmore to his former position with his former seniority. This interpretation accords with clear authority that "invit[ing] [employees] to return only as new employees without seniority" fails to satisfy the "purpose of requiring reinstatement ... to undo the employer's wrong by restoring the employees to the position they occupied before the wrong occurred." Ridgely Mfg. Co. v. NLRB, 510 F.2d 185, 188 (D.C.Cir.1975) (per curiam). In addition, the Board's interpretation of the original order closely follows prior precedent that a company did not satisfy its obligation to reinstate when it reemployed an employee at the bottom of the seniority list. See Deauville Hotel v. Gonzales, 256 N.L.R.B. 561, 561 (1981), enforcement denied on other grounds, 751 F.2d 1562 (11th Cir.1985). The Board's interpretation in Ryder System II of its Ryder System I order was well within its substantial discretion.
 
 
 38
 Third, Ryder contends that the Supreme Court's decision in Ford Motor Co. v. EEOC, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), establishes that an employee's acceptance of his former job without his former seniority tolls backpay and constitutes a waiver of the seniority. Ryder misreads the case. The Court actually held that the backpay is tolled when an employee refuses an offer of reemployment without former seniority. However, the Court relied on the principle that such refusal amounted to a failure to mitigate damages, and that this failure justified the tolling of the backpay. Here, Elmore accepted the insufficient reinstatement, thereby successfully mitigating damages.
 
 
 39
 Fourth, Ryder argues that the 1986 order was unclear and required Ryder "to guess" at Elmore's seniority ranking. Ryder notes that after the December 3, 1983 layoff, Elmore did not file an application until December 4, 1983. Ryder's rejection of this application was held to constitute an unfair labor practice. Ryder contends that it cannot determine Elmore's seniority, and it further contends that if a seniority date can be determined at all, the date should be determined using the December 4 application.
 
 
 40
 We again disagree with Ryder. When the original order is read in its entirety, it clearly indicates that Ryder was obligated to reinstate the drivers with the same seniority they possessed before the layoff. Ryder's unlawful refusal to hire should not have any effect at all.
 
 
 41
 Fifth, Ryder argues that the effect of the Board's action is to force Ryder to reinstate Elmore to a position from which Ryder had lawfully discharged Elmore in 1987. This, Ryder contends, violates the NLRA, which reads, in pertinent part:
 
 
 42
 No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause.
 
 
 43
 29 U.S.C. § 160(c). Ryder's argument mistakenly assumes that it had, prior to Elmore's discharge, sufficiently reinstated him. We realize that once employees are fully reinstated to their former positions, an employer may discharge them for any legal reason. Had Ryder reinstated Elmore with his former seniority in 1985, then Ryder "would have had no more obligation to employ him ... than it had to employ any ... other employees." Golden State Bottling Co. v. NLRB, 414 U.S. 168, 188 n. 10, 94 S.Ct. 414, 427 n. 10, 38 L.Ed.2d 388 (1973). As noted above, however, Ryder had not sufficiently reinstated Elmore because it did not grant him his former seniority ranking. The Board may therefore order reinstatement to his pre-December 1983 position with his former seniority. Webb, 888 F.2d at 510.
 
 
 44
 We conclude that the Board acted within its discretion when it held that the 1985 hiring was not a sufficient reinstatement and that Ryder's backpay liability and reinstatement obligation did not cease in 1985. We hold that backpay liability continued during Elmore's work with Ryder, although Ryder owes him no net backpay for that period.[2] Ryder does, however, owe Elmore backpay for the time after the March 1987 discharge.[3] In addition, the Board acted within its discretion in deciding that Ryder remains under a continuing obligation to reinstate Elmore.
 
 D.
 
 45
 Elmore's Willful Loss of Earnings Due to 1987 Discharge
 
 
 46
 Ryder advances the defense that its backpay liability to Elmore ceased when he incurred a willful loss of earnings. Granting for the purposes of this issue that its October 1985 hiring of Elmore was not a sufficient reinstatement, Ryder maintains that Elmore incurred a willful loss of earnings by his course of conduct that caused Ryder to discharge him in March 1987.
 
 
 47
 An employer may mitigate his backpay liability by showing that a discriminatee "willfully incurred" a loss of earnings by a "clearly unjustifiable refusal to take desirable new employment." Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 199-200, 61 S.Ct. 845, 855, 85 L.Ed. 1271 (1941). The defense of willful loss of earnings is an affirmative defense, and the employer bears the burden of proof. Westin Hotel, 758 F.2d at 1129. This court may overturn the Board's conclusion that an employer has not established the defense "only if the record, considered in its entirety, does not disclose substantial evidence to support the Board's findings." Id. at 1130.
 
 
 48
 We believe that our previous characterization of the October 1985 hiring is relevant to this issue. If the hiring had been a sufficient reinstatement, it would have satisfied Ryder's obligation under the initial order. But the hiring was not a sufficient reinstatement, and Elmore's employment with Ryder from October 1985 to March 1987 is properly viewed as interim employment. Therefore, this court shall apply the standards used to evaluate interim employment with an employer other than the employer that had unlawfully terminated or refused to hire the discriminatee.
 
 
 49
 The facts pertinent to this issue are these: In March 1987, approximately eighteen months after being hired, Elmore was discharged by Ryder for insubordination. The discharge resulted from an encounter between Elmore and Anthony Chrestman, Ryder's operations manager. Elmore apparently suspected that the tractors to which he was assigned were illegally altered to frame him, and he received advice to volunteer for a Department of Transportation (DOT) inspection of every truck in which he was dispatched. When he related this to Chrestman, Chrestman said he should not volunteer and instructed Elmore to meet with him to discuss DOT inspections.
 
 
 50
 Subsequently, Chrestman held Elmore's paycheck, so that when Elmore came in to pick it up he and Chrestman would be required to meet. When Elmore returned to the depot, he was informed that Chrestman wanted to talk with him. Elmore was accompanied by a fellow driver, Harold Baker, to the meeting with Chrestman. Chrestman stated that he wanted to confer with Elmore alone, and asked Baker to leave. Elmore insisted that the other driver stay, stating: "Well, if Harold leaves, I will leave." Chrestman told Elmore he would be terminated if he left. Elmore replied: "Well, you better start writing." Elmore then left the office and Chrestman immediately discharged him for insubordination.
 
 
 51
 In a separate unfair labor practice proceeding arising from this discharge, the Board found that Ryder's action was lawful. In the present backpay proceedings, the Board considered the circumstances of the March 1987 discharge and disagreed with Ryder's contention that the discharge tolled backpay liability. The Board reasoned:
 
 
 52
 Although this assertion by Elmore of a purported Weingarten right might have been erroneous, and even provided the basis for a lawful discharge, we find that it did not meet the misconduct standard ... any more than it would have had Elmore been hired by a different interim employer and discharged for the same reasons relied on by the Respondents here.
 
 
 53
 Ryder System II, slip op. at 5 (footnote omitted).[4] Before this court, Ryder asserts that Elmore "forced the issue" and that this "intentional misconduct clearly rises to a level of egregiousness sufficient to toll Ryder's back pay liability." We disagree, and conclude that the facts of the discharge do not support Ryder's contention that Elmore's conduct was so extreme as to justify a tolling of backpay liability. Persuasive precedent indicates that a discharge from interim employment will toll backpay liability only if the employee's misconduct was "gross" or "egregious." The Seventh Circuit has held that a discharge from interim employment, without more, does not reduce a backpay award. NLRB v. P*I*E Nationwide, Inc., 923 F.2d 506, 513 (7th Cir.1991). Rather, whether a discharge tolls backpay liability "hinges upon the factual determination of whether [the employee's] discharge from [the interim employer] constituted a discharge for gross misconduct." Id. at 512. This holding accords with the NLRB's own inquiry in such cases, which is whether the employee's "conduct was so egregious as to warrant forfeiting of his right to reinstatement and backpay." Deauville Hotel, 256 N.L.R.B. at 561.[5]
 
 
 54
 Courts have refused to enforce reinstatement orders where the employee showed extreme disloyalty toward the employer, threatened a supervisor with physical violence, and made damaging remarks to a customer. See NLRB v. Retail Store Employees Union, Local 876, 570 F.2d 586, 594 (6th Cir.), cert. denied, 439 U.S. 819, 99 S.Ct. 81, 58 L.Ed.2d 109 (1978). In this case, although Elmore's conduct constituted insubordination, it was not as extreme as the conduct in those situations where reinstatement was not enforced. The record indicates that prior to the meeting with Chrestman, Elmore had not disobeyed any orders from his supervisors, including Chrestman. At the meeting in question, Elmore did not threaten Chrestman, and he neither made loud remarks nor used profanity. Our review of the record indicates that although the meeting ended in disagreement, Elmore was restrained in his conduct and did not harm the Ryder trucking operation.
 
 
 55
 The Board made a factual finding that Elmore did not engage in gross misconduct, and we believe substantial evidence supports this finding. Elmore's conduct was not so egregious that the Board could not reasonably conclude that Ryder was still obligated to reinstate him.
 
 III.
 RYDER'S BACKPAY LIABILITY TO BRISCOE
 A.
 Background
 
 56
 Like Elmore, Briscoe was laid off by Diesel Recon on December 3, 1983, and immediately thereafter was refused employment by Ryder. In the two years following his layoff, Briscoe worked ten different jobs, eight of which were with trucking firms. In November 1985, Briscoe left truck driving and became a service station manager for a few months. In April 1986, Briscoe began working as a painter in his father's business, and he remained in this position until Ryder reinstated him in May 1988.
 
 
 57
 In Ryder System II, the Board affirmed the ALJ's order directing that Ryder pay Briscoe $79,267.98 in backpay. In opposition to this award, Ryder advances the defense that on three occasions, Briscoe incurred a willful loss of earnings. One occasion, discussed in Part IV, also involved Elmore.
 
 B.
 
 58
 Voluntary Loss of Earnings By Leaving Southeast in January 1985
 
 
 59
 Ryder contends that Briscoe's backpay should be tolled during a period of time that Briscoe was not working between his sixth and seventh jobs after the layoff.
 
 
 60
 Briscoe's sixth job was with Southeast Carriers as a truckdriver from December 1984 to January 1985. Briscoe left Southeast to work for Dixie Auto Transport, a position that began approximately a month after he left Southeast. Ryder notes that when Briscoe quit Southeast, he did not have a job already arranged at Dixie, and in fact did not start working for Dixie until a month later. Ryder contends that the backpay should be tolled for the four weeks between jobs.
 
 
 61
 We disagree. Briscoe testified that he quit Southeast because drivers there were stealing from the company and he did not want to become entangled in their misconduct. The ALJ credited Briscoe's testimony and found that Briscoe's decision was justifiable. Ryder offers no proof that Briscoe left for an unjustifiable reason.
 
 
 62
 A claimant who leaves his job for a justifiable reason does not forfeit his right to additional backpay. Mastro Plastics Corp., 136 N.L.R.B. 1342, 1349 (1962), enforced, 354 F.2d 170 (2d Cir.1965), cert. denied, 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966). The employer bears the burden of proof to establish the defense of willful loss of earnings, Westin Hotel, 758 F.2d at 1129, and Ryder failed to carry it. We conclude that the Board did not abuse its discretion in declining to toll Briscoe's backpay during the time between the Southeast and Dixie jobs.
 
 C.
 Abandoning Relevant Job Market
 
 63
 Ryder argues that its backpay liability to Briscoe should be tolled when Briscoe left the truck driving industry in November 1985. Although Ryder makes its strongest arguments of the appeal on this issue, we are unable to say that the Board abused its discretion in rejecting Ryder's argument.
 
 
 64
 After his layoff in December 1983, Briscoe diligently sought work as a truckdriver. From December 1983 to November 1985, he worked as a driver for seven different trucking firms; in addition, he applied to over twenty other trucking companies. These applications included two to Ryder--in December 1983 and then again in November 1985. In November 1985, Briscoe left his position as a truckdriver with Associated Transportation Services and began working for Gurley Chevron as a service station manager. After the service station folded in April 1986, Briscoe began working with his father as a painter; the painting job continued until Ryder reinstated Briscoe in May 1988.
 
 
 65
 Before the ALJ, Briscoe testified that after he began working as a painter, he wanted to get back into trucking "only if I could get my job back with Diesel Recon." At this time, Briscoe ceased looking for work in the trucking business, and the record indicates that the last application he made to a trucking company was his Ryder application in November 1985. The ALJ held that Briscoe's decision was legitimate because he was earning as much or more as a painter than he was as a truckdriver.
 
 
 66
 Ryder contends that when Briscoe ceased looking for work as a truckdriver, he removed himself from the relevant job market and thus incurred a willful loss of earnings. We disagree, and hold that the Board did not abuse its discretion when it found that Briscoe did not incur a willful loss of earnings.
 
 
 67
 We note initially that an employee who, like Briscoe, was wrongfully rejected "is only required to make a reasonable effort to mitigate damages, and is not held to the highest standard of diligence. This burden is not onerous, and does not mandate that the plaintiff be successful in mitigating the damage." Westin Hotel, 758 F.2d at 1130. A backpay claimant is under no duty to remain in the same industry as that from which he was discharged. Fugazy Continental Corp., 276 N.L.R.B. 1334, 1340 (1985), enforced, 817 F.2d 979 (2d Cir.1987).
 
 
 68
 Although the Board concedes that Briscoe's average weekly wages as a truckdriver may have been higher than his wages as a painter, it notes that his painting position was long-term and reliable, whereas the numerous truck driving positions Briscoe filled until November 1985 were short-term and infrequent. In addition, Briscoe diligently sought truck driving jobs for two years after Ryder refused to hire him and before choosing to work as a painter. The Board found that Briscoe's conduct did not amount to a willful loss of earnings, and we find that the record, considered in its entirety, contains substantial evidence to support the Board's finding. Westin Hotel, 758 F.2d at 1130.
 
 
 69
 Ryder makes much of help-wanted advertisements it placed in the record in support of its claim that there were truck driving jobs available if Briscoe wanted one. We are not persuaded. Ryder's reliance on the advertisements is not convincing. It "failed to produce evidence of employment specifically available or employment offers [the discriminatee] refused to accept." Kawasaki Motors, 850 F.2d at 528.
 
 
 70
 Finally, we note that Ryder's own dilatory tactics contributed to the amount of backpay it owes Briscoe. The ALJ issued his original decision in August 1985 ordering Ryder to reinstate Briscoe and his fellow drivers. Three months later, Briscoe submitted an application to Ryder. Ryder, however, in a decision to which the adage "penny-wise but pound-foolish" aptly applies, rejected Briscoe's application and chose to wait until it exhausted all its appeals. Such a decision was, of course, Ryder's prerogative; however, it must now face the costly consequences of its choice.
 
 
 71
 We conclude that the Board acted within its discretion when it held that Briscoe did not incur a willful loss of earnings when he ceased seeking work as a truckdriver but remained in his position as a painter.
 
 IV.
 
 72
 CONSEQUENCES OF BRISCOE'S AND ELMORE'S DECISION TO LEAVE JOB AT OZARK
 
 
 73
 Ryder argues that its backpay liability as to both Elmore and Briscoe should be tolled based on their decisions in 1984 to leave positions at Ozark Motor Lines to take new jobs at Jones Truck Lines. Ryder argues, as to both drivers, that this decision constituted a willful loss of earnings.
 
 
 74
 The relevant facts are these: After the December 1983 layoff, Elmore's first employment began in March 1984 as a full-time truckdriver for Ozark, where he was compensated at $0.17/mile. Elmore stayed at Ozark until June 1984, and his average weekly wages were approximately $400. On the advice of his union agent, Elmore applied for and accepted a job as a freight handler at Jones. The hourly wage at Jones was $13.23. Elmore remained at Jones approximately two months, when Jones eventually stopped calling him into work--essentially, Jones laid him off. His average weekly salary with Jones was approximately $300.
 
 
 75
 After his layoff in December 1983, Briscoe held short-term jobs with two trucking companies in Memphis. Then, in May 1984, Briscoe began working for Ozark. Briscoe remained with Ozark until June 1984, and his average weekly salary was approximately $390. After Ozark, Briscoe, like Elmore, acted on information from a union business agent and accepted a job as a freight handler at Jones in June 1984. Briscoe remained at Jones until August 1984 when he, again like Elmore, was laid off. His average weekly salary with Jones was approximately $280.
 
 
 76
 The Ozark driving job was different than both drivers' former jobs at Diesel Recon because Ozark did not reimburse drivers for road expenses; ran drivers "around the clock"; and forced the drivers to unload their own trucks. As to the Jones positions, Elmore and Briscoe testified that they were not, at the outset, full-time positions. Rather, they were "casual" positions, meaning that they did not have regular hours but were called in as needed by Jones. Briscoe testified: "I think if they called you in they had to give you four hours but they generally gave you eight. But there was no status as far as permanent hire. You were strictly casual until they decided they wanted to hire you."
 
 
 77
 Ryder argues that Elmore and Briscoe left a higher-paying job with Ozark for a lower-paying job with Jones. Although the Jones job did, in fact, turn out to be lower paying, the Board concluded that this does not mean that the drivers incurred a willful loss of earnings. We agree with the Board.
 
 
 78
 We note that Elmore and Briscoe did not have a duty to continue their employment at Ozark because it was not equivalent to their former position with Diesel Recon in either pay or working conditions. "The employee is not required to seek or retain a job more onerous than the job from which he or she was discharged." Kawasaki Motors, 850 F.2d at 528. We also note that an employee need only make a reasonable effort to mitigate damages, and that the employee need not be successful. Westin Hotel, 758 F.2d at 1130.
 
 
 79
 Neither side disputes Jones positions were lower paying than the Ozark jobs. Nevertheless, the ALJ noted that Elmore had no "reason to suspect, when he took the warehouse job at Jones that he would be the victim of a business downturn two months later." The Board concurred, noting that Elmore "testified without contradiction that at the time he took the new job, he thought it would be a better-paying position. That it may not have resulted in higher wages will not serve to toll backpay." Ryder System II, slip op. at 6. As to Briscoe, the ALJ noted that Briscoe's layoff from Jones "was simply a circumstance over which he had no control and in no way indicated willful loss." These findings were within the discretion of the ALJ and the Board.
 
 
 80
 Ryder also argues that the decision of both men to take the Jones jobs was not justified because they were not full-time positions. The ALJ found, however, that in the trucking industry, new hires frequently begin in casual positions and work their way into full-time positions.
 
 
 81
 While we think the record leaves some doubt whether the Jones jobs truly represented a higher-paying opportunity than Ozark, we decline to reverse the Board's finding that the departures from Ozark did not constitute a willful loss of earnings. The burden is on Ryder to prove that the Jones jobs, when taken by Elmore and Briscoe, were lower paying. The ALJ's finding, adopted by the Board, was that Ryder failed to make the necessary showing. We conclude that the Board acted within its discretion in adopting this finding.[6]
 
 V.
 
 82
 We grant the NLRB's application for enforcement of its April 1991 order, Ryder System, Inc., 302 N.L.R.B. No. 93. (April 19, 1991).
 
 
 83
 DAVID A. NELSON, Circuit Judge, concurring in part and dissenting in part.
 
 
 84
 I agree with much of the court's opinion, but I would decide two of the questions presented differently.
 
 
 85
 The first such question is this: Larry Elmore having been lawfully discharged for cause in March of 1987, was it within the power of the Board to require that he be reinstated? The court's answer is "yes." Mine would be "no."
 
 
 86
 For more than two years prior to his discharge, Larry Elmore had been employed by respondent Ryder as a full-time, non-probationary, over-the-road truckdriver. This position--the one that Ryder had been ordered to offer him--was the same position in which Elmore had been employed by Diesel Recon Company prior to the unfair labor practice.
 
 
 87
 It is true that the Board's original order, as the Board construed it, required an offer of reinstatement without prejudice to the seniority rights Elmore had acquired at Diesel Recon. The Board decided that Elmore's seniority rights had been prejudiced, and I cannot quarrel with that decision. If his compensation had been adversely affected, therefore, I have no doubt that Elmore would have been entitled to be made whole. See Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 399-400, 102 S.Ct. 1127, 1135-1136, 71 L.Ed.2d 234 (1982) (affirming an award of retroactive seniority in a Title VII context).
 
 
 88
 It is undisputed, however, that Elmore's compensation was not adversely affected by the loss of seniority. Ryder's failure to comply with the proviso on seniority resulted in nothing more than damnum absque injuria. And even if Elmore's compensation had suffered--a situation that could always have been corrected retroactively, of course--it would still have been a fact that the job Elmore held was the job to which Ryder had been ordered to reinstate him. See Ford Motor Co. v. EEOC, 458 U.S. 219, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982), which clearly reflects an understanding that the identity of a particular job remains the same whether or not the job comes with retroactive seniority.
 
 
 89
 The employment that Ryder offered to Larry Elmore late in 1985 or early 1986 did not carry a guaranty of life tenure. Mr. Elmore's employment was terminated for cause on March 18, 1987, and the validity of the discharge was subsequently upheld in proceedings before the Board. The fact that there was just cause for the discharge is thus no longer open to question.
 
 
 90
 The Board has broad discretion to devise remedies that will effectuate the policies of the National Labor Relations Act, to be sure, but the Board has no discretion to do that which the Act says it shall not do. Section 10(c) of the Act says, in the plainest of English, that "[n]o order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged ... if such individual was suspended or discharged for cause." 29 U.S.C. § 160(c). It is indisputable that Larry Elmore was discharged "for cause" from his position as a full-time, non-probationary, over-the-road truckdriver. If § 10(c) means what it says, therefore, no order of the Board may require Elmore's reinstatement to that position.
 
 
 91
 David R. Webb Co. v. NLRB, 888 F.2d 501 (7th Cir.1989), cert. denied, 495 U.S. 956, 110 S.Ct. 2560, 109 L.Ed.2d 743 (1990), does not suggest a contrary conclusion. The three employees involved in that case were hired as "dryer-feeders" following a strike. Prior to the strike one of the employees had been a "labeler," one a "flitch cleaner and handler," and one a "truck driver, fork-lift operator and storeroom clerk." Id. at 502 n. 3. The dryer-feeder position was a different job, and a lower level one. Id. The Court of Appeals held that the employees' lawful discharge from the dryer-feeder jobs did not bar the NLRB from directing that they be reinstated to their pre-strike positions. It would have been otherwise, however, if the employees had been dryer-feeders before the strike: "Had the Board ordered reinstatement to the dryer-feeder position, [29 U.S.C.] § 160(c) would effectively prohibit such reinstatement." Id. at 510.
 
 
 92
 In the case at bar, as we have seen, Larry Elmore was employed as an over-the-road truckdriver both before and after Ryder committed the unfair labor practice. Section 160(c) thus effectively prohibited the Board from ordering Elmore's reinstatement to that position after he had been fired for cause.
 
 
 93
 * * *
 
 
 94
 The second question on which the majority and I part company is whether Ryder's backpay liability to employee Carl Briscoe should have been tolled when Briscoe stopped seeking employment in the trucking business and went into an unrelated (and less lucrative) line of work. I would answer this question in the affirmative.
 
 
 95
 "The general rule in labor cases is that 'an employee must at least make reasonable efforts to find new employment which is substantially equivalent to the position [[he] lost] ... and is suitable to a person of his background and experience.' " NLRB v. Westin Hotel, 758 F.2d 1126, 1130 (6th Cir.1985), quoting NLRB v. Madison Courier, Inc., 472 F.2d 1307, 1318 (D.C.Cir.1972), as quoted in Heheman v. E.W. Scripps Co., 661 F.2d 1115, 1125 (6th Cir.1981), cert. denied, 456 U.S. 991, 102 S.Ct. 2272, 73 L.Ed.2d 1286 (1982). "The reasonableness of the effort to find substantially equivalent employment should be evaluated in light of the individual's background and experience and the relevant job market." Westin, id.
 
 
 96
 The record in the case at bar establishes that although help-wanted advertisements for truckdrivers were plentiful during the period with which we are concerned, Mr. Briscoe made no effort at all to find a job as a truckdriver. Briscoe's own testimony shows that he had no interest in getting back into trucking unless he could have his old job; he simply was not looking for substantially equivalent work.
 
 
 97
 Where, as here, the evidence leaves no room for doubt that an employee has willfully failed to seek substantially equivalent employment in mitigation of his losses, and the Board has awarded backpay without taking this circumstance into account, the proper course is to have the Board recompute its award. NLRB v. Seligman and Associates, Inc., 808 F.2d 1155, 1168 (6th Cir.1986), cert. denied, 484 U.S. 1026, 108 S.Ct. 750, 98 L.Ed.2d 763 (1988). I find nothing to the contrary in NLRB v. Fugazy Continental Corp., 817 F.2d 979 (2d Cir.1987).
 
 
 
 [1]
 Actually, Elmore was hired as a "casual" driver in October 1985 and became a "full-time driver" after a probationary period
 
 
 [2]
 A discriminatee accrues backpay liability during interim employment, but the amount of the interim earnings is deducted from the gross backpay accrued to arrive at the net backpay owed to the discriminatee. From October 1985 to March 1987, Elmore earned more interim earnings than gross backpay due to him. Thus, he did not accumulate any net backpay during this period
 
 
 [3]
 The court notes that in April 1991, the regional director of the NLRB informed Elmore that any backpay he was accruing would cease as of April 1, 1988, because Elmore stopped cooperating with the regional office by refusing to provide information about his search for interim employment. This action, while not affecting the issue of Ryder's liability for backpay, may affect the amount of backpay ultimately due
 
 
 [4]
 A union member has the right--a Weingarten right--to union representation during an interview that he reasonably fears will result in disciplinary action. NLRB v. J. Weingarten, Inc., 420 U.S. 251, 259-62, 95 S.Ct. 959, 964-66, 43 L.Ed.2d 171 (1975)
 
 
 [5]
 We note that the Board also recognizes that a discharge for an offense involving "moral turpitude" may constitute a willful loss of earnings. See, e.g., Lundy Packing Co., 286 N.L.R.B. 141, 146 (1987), enforced, 856 F.2d 627 (4th Cir.1988). In this case, Ryder does not allege that Elmore committed such an offense
 
 
 [6]
 In addition to contending that Jones was a lower-paying job, Ryder makes additional arguments relating only to Elmore that his backpay should be tolled as a result of his quitting Ozark. These include contentions that Elmore quit Ozark before Jones actually hired him, that Elmore was not laid off by Jones because the Jones position did not involve regular hours at the outset, and that Elmore left Ozark because the Jones job was a union job. We find these contentions without merit